UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

TIMOTHY ALLEN TEAGAN,

        Defendant.
_____/

Criminal No. 22-cr-20591

Hon. Sean F. Cox

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through undersigned counsel, submits this memorandum to inform the Court of the government's sentencing recommendation. The defendant, Timothy Allen Teagan, has a chronic criminal record, a long history of violent conduct towards family and acquaintances, a serious drug addiction, and has violated numerous court orders – all of which he has accomplished before turning 25 years' old. Added to this concerning mix is the criminal conduct at issue in this case, namely, Teagan's illegal possession of multiple firearms. A guideline sentence of 13 months and one day is needed to deter him from the path of criminality he is current on and prevent him from hurting others.

BACKGROUND

In the early morning hours of October 25, 2022, Defendant viciously beat his father, and not for the first time. Police were called to the home of Defendant's father on Cherry Street in Plymouth, Michigan, and found Defendant's father with "blood dripping down his face," his eyes and his mouth were "swollen and there were teeth marks on his forehead that were bleeding." (PSR p. 14, ¶ 49). Police officers spoke with Defendant, his father, and his adult brother at the scene before arresting Teagan for domestic violence. According to these witnesses, Teagan initiated the violence when his father told him not to drive a van parked in the driveway because Teagan was intoxicated. Teagan took offense at the suggestion that he not drive drunk, followed his father into the house, and "started throwing punches at his [father's] face with a closed first." *Id.* The severity of the father's injuries were observed, documented, and photographed by the police. (*Sealed Exhibit 1: Photos of Defendant and Johnathan Teagan, Jr. from 10/25/2022*). Defendant was observed to have "bloody knuckles" from repeatedly striking his father. (PSR, p. 14, ¶ 49).

The Defendant's brother, Christopher Teagan, who also lived at the Cherry Street residence, told police officers there were guns inside the home. (PSR, p. 7, ¶ 17). While walking through the Cherry Street home, officers observed in plain

2

view several rounds of AR-15 style ammunition, a gun safe, metal/brass knuckles, gas masks, a plate carrier, a package containing what appeared to be marijuana, and various drug paraphernalia – all of which were inside Defendant's bedroom. (PSR, p. 7, ¶ 18). Defendant's father told officers that Defendant "loved" marijuana, and he was the sole marijuana user in the home.

On October 25, 2022, Defendant's father spoke to an agent of the Federal Bureau of Investigation. Defendant had come to the FBI's attention as the result of his membership in the anti-government extremist Boogaloo movement.[1] (PSR, p. 6, ¶ 12-13). The Defendant's father stated that he owns the Cherry Street home, but Defendant had recently been living there. (PSR, p. 7, ¶ 18). The father who is prohibited from possessing firearms, told the agent that Defendant legally owns an

---

[1] Some domestic violent extremists (DVEs) use the "boogaloo" concept to reference a violent uprising or impending civil war. The concept has resonated with militia violent extremists, who have adopted it to reference an impending politically-motivated civil war or uprising against the government following perceived incursions on Constitutional rights—including the Second Amendment—or other perceived government overreach. Some racially or ethnically motivated violent extremists (RMVEs) have used the term to reference an impending race war—or other conflict that will lead to the collapse of the "system," including the US government, society, etc. DVEs may allude to the boogaloo concept by using shorthand terms such as "big igloo" or "big luau" and imagery such as igloos or Hawaiian shirts. The boogaloo is not a single cohesive group, but rather a loose concept arising from internet platforms which has become a rallying point for some violent extremists.

AR-15 rifle and at least one Glock handgun, that the guns in the house were stored in a safe in Defendant's room, and that Christopher Teagan and Defendant each have a key to the safe. (PSR, p. 7, ¶ 18). The father further stated he did not have access to the guns and has repeatedly asked Defendant to remove them from the premises, but Defendant has refused to do so.

On October 26, 2022, at approximately 1:55 p.m., Defendant was released from state custody and placed on bond with conditions, including that he reside at his grandparents' home in Plymouth, Michigan. (PSR, p. 7, ¶ 19). He was ordered to "immediately notify the court, in writing, of any changes to his address," to "surrender all firearms to law enforcement," to "not possess firearms/weapons," and to "not possess or use any controlled substances, which included marijuana, both, recreational and medical." *Id.* Defendant ignored all of these conditions.

On October 27, 2022, FBI agents executed a federal search warrant at the Cherry Street home. (PSR, p. 8, ¶ 20). In Defendant's bedroom, agents found an AR-15 rifle, dozens of rounds of both rifle and 9mm ammunition, multiple AR and 9mm magazines, a rifle sight and rifle stock fore-grip, multiple containers of marijuana, bongs and other drug paraphernalia, a plate carrier vest, Level IV body armor, Boogaloo movement flags and patches, and gas masks. (*Id.*). The Defendant's Glock 34, 9mm handgun was missing. (*Id.*).

As agents arrived at the Cherry Street residence at approximately 2:20 p.m. to execute the search warrant, they learned Defendant was seeking medical attention at a local hospital. Christopher Teagan arrived at the Cherry Street residence at approximately 3:30 p.m. and told agents that he had delivered a "ton of weed" to Defendant, along with some clothes. (PSR, p. 8, ¶ 21). A search of Defendant's cellular phone later revealed that, while the search was being conducted, Defendant and Christopher Teagan spoke by phone and Defendant texted his girlfriend that: "the FBI is raiding the house right now." (PSR, p. 8, ¶ 22). At 4:09 p.m., in a group text, Christopher Teagan asked Defendant, "Should I give em the pistol." (*Id.*). Defendant responded, "Only if they ask" and added, "More or less demand." (*Id.*). After initially stating he did not know where his brother's handgun was located, Christopher Teagan consented to the search of his vehicle, and agents seized Defendant's Glock 34, 9mm handgun from the trunk. (PSR, p. 8, ¶ 21).

During the course of the investigation, FBI agents learned that Defendant is a long-time marijuana user. Christopher Teagan told agents Defendant has been smoking marijuana since he was 10 years old, and that he smokes four to five times per day. (PSR, p. 8, ¶ 23). The defendant's father told FBI agents that he was unable to tell when Defendant was high, because he is always high. On October 27,

5

2022, Defendant told FBI agents that he is a marijuana user and he admitted that his brother Christopher Teagan brought marijuana to him the day prior (October 26, 2022). (PSR, p. 8, ¶ 23, 25). Further evidence of Defendant's longtime use of marijuana was captured in a publicly available video of Defendant at a protest in Ann Arbor in April 2021. (PSR, p. 6, ¶ 15). In the video, Defendant is pictured holding an AR-15 style rifle, with a partially clear sided magazine inserted into the rifle, allowing the viewer to see ammunition present in the magazine. While holding the loaded firearm, Defendant stated: "I love this city. I smoke plenty of weed in this city, believe me. Been to hash bashes before." (*Id.*).

      Further investigation revealed that on July 17, 2022, Defendant submitted an ATF Form 4473 for the purchase of the Glock 34, 9 mm handgun. (PSR, p. 7, ¶ 16). When signing the form, he certified that the information provided was accurate under penalty of prosecution. Defendant denied being a drug user, answering "no" to question 21. E, of Section B, on the form, which states: "Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance? Warning: The use or possession of marijuana remains unlawful under Federal law regardless of whether it has been legalized or decriminalized for medicinal or recreational purposes in the state

6

where you reside." (*Id.*). Defendant re-certified the accuracy of this information when he completed the purchase of the Glock 34 on July 20, 2022. (*Id.*).

On October 29, 2022, a sealed federal complaint and arrest warrant were issued charging Defendant with being a drug user in possession of firearms and ammunition, and for making a false statement in connection with the acquisition of a firearm. (PSR, p. 4, ¶ 1). Defendant's whereabouts were unknown at the time, but he was believed to be living in the area, hotel hopping – in direct violation of his state bond conditions that he live at his grandparents' house in Plymouth. Agents later learned Defendant had been staying at the Comfort Inn, Livonia, Michigan, with Alex Powers, in a room registered to Alex Powers. Defendant was not named as a guest in the room. On October 31, 2022, Defendant and Alex Powers checked into the Baymont Wyndham hotel in Canton, Michigan, in a room registered to Alex Powers. Defendant was not named as a guest in that room either.

Defendant was arrested on November 1, 2022, outside a restaurant in Plymouth, Michigan. (PSR, p. 8, ¶ 24). Defendant had been driving Christopher Teagan's car. After obtaining consent to search the car, agents found a fixed blade knife and sheath among Defendant's possessions – a direct violation of his state bond condition that he not possess any weapons. (*Id.*).

During the consent search of Defendant's hotel room, Alex Powers identified Defendant's bag. Inside the bag was another bag labeled with Defendant's name that contained personal effects from his domestic violence arrest, a marijuana grinder, and packages of marijuana – a direct violation of his state bond condition that he not possess marijuana. (PSR, p. 8, ¶ 24). These bond conditions were known to Defendant because a copy of his bond papers, along with the federal search warrant for the Cherry Street residence, were found on a table in the hotel room.

Defendant told FBI agents that he had his Glock firearm in the hotel room on October 27, 2022 – yet a fourth violation of his state bond conditions, namely the prohibition on him possessing firearms. (PSR, p. 8, ¶ 25). Defendant admitted his brother brought him marijuana when he was released from jail and that he knew his bond conditions required him to live at grandparents' home in Plymouth, but he did not believe that the court cared if he was hotel hopping. (*Id.*). Defendant stated he planned to continue to hotel hop until one of his friends rents a house and he can become their roommate.

Teagan was indicted by a grand jury on three counts. (ECF No. 17, PgID.138). Count One charged Teagan with being a drug user in possession of a firearm, namely the AR-15 rifle and ammunition he had in the Cherry Street home,

8

in violation of 18 U.S.C. § 922(g)(3). Count Two charged the same offense for the Glock pistol Teagan had in his hotel room and brother's car after he received bond. And Count Three charged Teagan with making a false statement in connection with acquisition of a firearm, in violation of 18 U.S.C. § 922(a)(6). Teagan subsequently pleaded guilty to Counts One and Three pursuant to a Rule 11 plea agreement. (ECF No. 27, PgID.162). The Probation Department correctly calculated his Sentencing Guideline range to be 12 to 18 months' imprisonment. (PSR, p. 22, ¶ 88).

## ARGUMENT

In fashioning a sentence, a court shall consider, among the other factors set forth in 18 U.S.C. § 3553(a), "the nature and circumstances of the offense," "the history and characteristics of the defendant," the need for "adequate deterrence to criminal conduct," and the applicable sentencing guidelines.

A.    The Sentencing Guidelines

Defendant's guideline range of 12 to 18 months' imprisonment "should be the starting point and the initial benchmark" for choosing his sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). This is because the Guidelines "reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives." *United States v. Rita*, 551 U.S. 338, 350 (2007). A sentence within the guideline

range is appropriate given Defendant's history of violent conduct, chronic criminal behavior, and failure to abide by court orders.

      B.      <u>Adequate Deterrence and Protection of the Public</u>

Teagan is only 25 years old and has already engaged in multiple acts of violence and threatened use of weapons:

- At the age of 16, Defendant was arrested for domestic violence after he headbutted Christopher Teagan and "tried to gouge his eye out with his [Defendant's] thumb." (PSR, p. 13, ¶ 47). Defendant's father tried to separate his sons and was "unintentionally punched in the faceab several times by [Defendant]." (*Id.*). When the two sons were finally separated, Defendant went into the house and retrieved a sword which he used to threaten his father and brother. (*Id.*). When police arrived, they found Defendant's father with "fresh bruising around his eye and blood dripping from his nose." (*Id.*). The charges against Defendant were later dropped.

- At the age of 19, Defendant was charged with numerous offenses after he "became furious" with Christopher Teagan for accidentally backing his car into the car of Defendant's friend. (PSR, p. 11, ¶ 42). Defendant tackled Christopher Teagan and, when Defendant's father tried to intervene, Defendant bit his father "hard enough to draw blood." Defendant got a 27-inch long sword with a double-edged blade from his bedroom and held the blade to his father's neck and stated: "Don't you test me." (*Id.*). Defendant chased his father and Christopher Teagan with the sword and stabbed the refrigerator three times with it. Defendant admitted to striking the refrigerator with the sword and also confessed that during the altercation he "fired an airsoft gun at Christopher and [his father]." (*Id.*). Defendant pleaded guilty to assault and battery and was sentenced to just 12 months' probation. (*Id.*).

10

- At the age of 23 – and just seven months before he brutally beat his father that led to the current case – Defendant had a political argument at friend's house and "punched his friend in the head three times with a closed fist." (PSR, p. 13, ¶ 48). Defendant then "kicked the friend's wife in the face and threatened to shoot up their house with his AR-15 if they called the police." (*Id.*). The friend and wife refused to press charges and Defendant was not arrested. (*Id.*).

These three violent attacks by Defendant are in addition to the vicious assault on his father in October, 2022, that ultimately led to the current gun charges. Collectively, these events show that Defendant is a danger to others. He cannot control his anger and he is fully capable of using weapons – both blades and firearms – to effectuate his violent impulses. These behaviors make his illegal possession of the AR-15 and Glock pistol particularly troubling and worthy of a significant sentence. In addition, a significant sentence is needed in order to deter Defendant from continuing to engage in violent conduct. To date, the state criminal justice system has either imposed lenient sentences or failed to prosecute Defendant for his violent conduct. Those outcomes have not caused Defendant to reform his behavior. Rather, his violent conduct has only continued. A significant sentence from this Court is needed to break the cycle.

  C. <u>The History and Characteristics of the Defendant</u>

11

Defendant's history and characteristics show little sign that his pattern of criminality will cease. Defendant's recent behavior shows that he has no respect for the law or court orders. For example, once Defendant was placed on bond for the state domestic violence charges, he immediately violated the bond conditions by possessing a pistol and knife, possessing marijuana, and living at hotels rather than his approved residence. Defendant's long history of abusing drugs also gives little confidence that he will reform. Remarkably, Defendant has used marijuana "all day, every day" from age 14 up until his arrest in this case. (PSR, p. 18, ¶ 72). He also uses "alcohol, cocaine, ecstasy, hallucinogens, and lysergic acid diethylamide (LSD)." (*Id.*). Despite being self-aware of the extent of his drug habit, Defendant has "never participated in substance abuse treatment" prior to his arrest in this case. (PSR, p. 19, ¶ 73). Such a chronic and longstanding addiction can only be overcome with hard work and determination – two qualities that Defendant not demonstrated prior to his current arrest given that he has never even sought treatment. Even the one bright spot in Defendant's history – namely his employment as a pizza delivery driver – is marred by his own criminality as text messages from his phone indicate that he used marijuana while working as a delivery driver.

Defendant will, undoubtedly, seek to lay responsibility for his behavior at the feet of his deeply troubled parents who apparently suffered from addiction and mental illness. But doing so would ignore the fact that for the majority of his childhood (age 6 through 18), Defendant lived with his grandparents – one of whom is a retired Ford Motor Company engineer and military veteran – who provided Defendant with "safety and stability until the defendant became an adult." (PSR, p. 24, ¶ 107). And in any event, there is nothing in Defendant's background as a child, whether living with his parents or grandparents, that would excuse the violent acts he has perpetrated since becoming an adult. And while Defendant may have recently completed a drug and alcohol program, and partially completed a domestic violence program, while incarcerated on the present case, these small steps, while certainly positive, are insufficient to overcome the concerns about his future dangerousness given his decade-long pattern of criminality.

## CONCLUSION

For all the foregoing reasons, the government requests that the Court impose a sentence of 13 months and one day incarceration on each count of conviction to run concurrently.

Respectfully submitted,

DAWN N. ISON
United States Attorney

*s/Saima S. Mohsin*
SAIMA S. MOHSIN
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9163
Saima.Mohsin@usdoj.gov

Date: August 3, 2023

**Certificate of Service**

I certify that on August 3, 2023, I electronically filed the Government's Sentencing Memorandum with the Clerk of the Court of the Eastern District of Michigan using the ECF system which will send notification of such filing to the following:

> Todd Shanker
> Attorney for Defendant

*s/Saima S. Mohsin*
SAIMA S. MOHSIN
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9163
Saima.Mohsin@usdoj.gov